OPINION
Appellant, Acme Steak Co., Inc. ("Acme") is a wholesale distributor of meat and other food products. Acme had contracted with Great Lakes Mechanical Corporation ("Great Lakes") to reconfigure an existing refrigeration system in order for it to operate as a freezer. Great Lakes was covered by a commercial general liability ("CGL") insurance policy issued by Appellee, Westfield Insurance Company ("Westfield"). Appellee, Vilter Manufacturing Corp. ("Vilter") manufactured a compressor which was used in the reconfigured freezer system.
Acme filed a complaint against Great Lakes and Vilter due to the failure of the freezer system. These appeals arise from two judgment entries of the Mahoning County Court of Common Pleas granting summary judgment in favor of Vilter and Westfield. Acme argues that there were genuine issues of material fact in dispute about Vilter's participation in the design of the new freezer system and whether it had breached any implied warranties. Acme also contends that Westfield has a duty to defend and indemnify Great Lakes under the terms of the CGL policy. Acme argues that the trial court erred in concluding that there was no "occurrence" or "accident" as defined by the CGL policy. For the following reasons, we affirm the judgment in favor of Vilter but reverse as to Westfield.
In 1994, Acme moved part of its operations to a facility in Austintown, Ohio. The building had previously been a grocery store warehouse with a refrigeration system. Acme and Great Lakes entered into a contract so that the refrigeration system would be converted into a freezer. The contract called for Great Lakes to reconfigure and revamp the refrigeration system, using parts of the existing system and adding some additional components, as necessary, to achieve temperatures between -10 degrees and -20 degrees Fahrenheit. Great Lakes was also required to test the system and make any repairs to insure that the entire configuration was free of leaks.
Great Lakes' plan to revamp the refrigeration system called for the installation of a new compressor, manufactured by Vilter. After the system had been in operation for a short time, the Vilter compressor failed. This contributed to the eventual failure of the entire system.
On September 27, 1994, Acme filed a complaint against Great Lakes. Acme alleged that Great Lakes negligently failed to properly design the revamped system, that the goods and materials did not conform to an implied warranty of fitness for a particular purpose or warranty of merchantability, that Great Lakes breached its contract and that the mechanic's lien filed by Great Lakes was invalid. On August 23, 1995, Acme amended its complaint to add Vilter as a defendant. Acme alleged that Vilter represented that its compressor had the capacity to maintain the required temperatures in Acme's freezer. Acme also averred that Vilter breached express and implied warranties by selling an inadequate compressor. Acme alleged that it suffered damages of over $200,000.00 for repair and replacement of its freezer, lost wages, lost profits and other damages.
On March 6, 1996 Vilter filed a Motion for Summary Judgment. The motion was granted on January 30, 1997.
On September 3, 1996, Westfield filed a Motion for Leave to Intervene in the case in order to protect its right as Great Lakes' insurer.
On December 9, 1997, Westfield filed a Motion for Default Judgment and/or Motion for Summary Judgment. On March 3, 1998, the court granted all parties leave until May 3, 1998, to file supplementary materials relative to Westfield's motion. The court granted summary judgment to Westfield on July 8, 1998, holding that Acme failed to plead or imply that an "occurrence" had taken place as required by the CGL policy in order to trigger Westfield's obligations under the policy.
Acme filed a timely appeal to the July 8, 1998 judgment, which was designated as Appeal No. 98-C.A.-146. On November 16, 1998, the trial court filed a Judgment Entry modifying its January 30, 1997, entry to include the language required by Civ.R. 54(B) for establishing a final appealable order. Acme filed a timely appeal of the modified order on December 15, 1998, which was designated as Appeal No. 98-C.A.-243. The two appeals were consolidated by order of this Court on May 4, 1999.
Acme's first assignment of error states:
 "The trial court erred in granting Vilter's motion for summary judgment because genuine issues of material fact exist as to whether Vilter participated in selecting the new compressor; whether Vilter breached an implied warranty of merchantability; and whether Vilter breached an implied warranty of fitness for a particular purposes."
An appellate court reviews a trial court's grant of summary judgment independently and without deference to the trial court's determination. Brown v. Scioto Bd. of Commrs.
(1993), 87 Ohio App.3d 704, 711. In so doing, an appellate court applies the same standard as the trial court in reviewing a motion for summary judgment. Peyer v. Ohio WaterService Co. (1998), 130 Ohio App.3d 426, 431. Summary judgment is properly granted under Civ.R. 56(C) when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Temple v. Wean United, Inc.
(1977), 50 Ohio St.2d 317, 327. In considering an appeal from a motion for summary judgment, a reviewing court should look at the record in the light most favorable to the party opposing the motion. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,360.
The moving party has the initial burden of informing the trial court of the basis for its motion and identifying in the record that there is an absence of a genuine issue of material fact concerning an essential element of the opponent's case.Dresher v. Burt (1996), 75 Ohio St.3d 280, 292. If the moving party satisfies its initial burden by specifically pointing to evidence of the type listed in Civ.R. 56(C), then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial. Id. at 293.
Acme argues that Vilter is responsible for the design defects in the freezer system because it consulted with Great Lakes to determine which specific compressor would be the most suitable for the Acme project. Acme concedes that a component manufacturer is not generally liable for the failure of the end product when the component itself is not defective or dangerous. Phan v. PresriteCorp. (1994), 100 Ohio App.3d 195, 200; Temple v. Wean United,Inc., supra, 50 Ohio St.2d at paragraph four of syllabus. Acme contends that a component manufacturer is liable when it contributes to the design or system into which its product is incorporated. Acme cites no Ohio authority to support this argument.
The obligations of a component parts manufacturer do not extend to the, "speculative anticipation of how manufactured components, not in and of themselves dangerous or defective, can become potentially dangerous dependant upon the nature of their integration into a unit designed and assembled by another."Temple v. Wean, supra, 50 Ohio St.2d at 324. One Ohio appellate court has held that component parts suppliers are, "not required to procure plans of the entire system, review those plans, and independently determine whether their respective component parts would function in a safe fashion." Searls v. Doe (1986),29 Ohio App.3d 309, 311.
The evidence presented by Acme in response to Vilter's request for summary judgment does not raise any genuine issues of material fact as to whether Vilter significantly contributed to the design of the freezer system. Acme relies on the deposition testimony of Mr. Charles Ruebensaal, president of Great Lakes, to show that Vilter was informed about the specific needs of the Acme freezer revamping project. Mr. Ruebensaal testified that he told Mr. William Lemke, a Vilter district manager, about the operational conditions under which the Vilter compressor would run, the suction requirements and the condensing temperatures. Mr. Ruebensaal testified that Vilter submitted drawings to Great Lakes after it had ordered the compressor. None of these facts suggest that Vilter designed the freezer system. A component parts supplier cannot be expected to operate in a factual vacuum when attempting to match its products to the needs of its customers. Mr. Ruebensaal himself, when asked directly if Vilter did any design work on the project, testified that Vilter only verified the specifications of the compressor and was not involved in the design or construction of the system. (Deposition, pp. 109-110).
Acme alleges that Great Lakes was only acting as the agent of Vilter and that Vilter should be held liable as the principal. Acme bases this argument solely on the testimony of Mr. Ruebensaal that Great Lakes and Vilter had a distributorship agreement for ten years. The most important element in determining whether an agency relationship exists is the principal's right to control the conduct of the agent. Hanson v. Kynast (1986), 24 Ohio St.3d 171, paragraph one of syllabus. Acme has pointed to nothing in the record suggesting that Vilter had the power to control Great Lakes' actions.
Acme further contends that Vilter should be liable because it breached an implied warranty of merchantability (R.C. § 1302.27) and an implied warranty of fitness for a particular purpose (R.C. § 1302.28). Acme's argument here fails for a variety of reasons. First, Acme did not present any evidence or even allege that it was in privity of contract with Vilter when Great Lakes purchased the Vilter compressor. There must be proof of a contract of sale between the seller and the party asserting the implied warranties described in R.C. §§ 1302.27 and .28. Pagan v. Stroh BreweryCo. (May 28, 1991), Mahoning App. No. 89 CA 93, unreported. "[A]bsent a contractual relationship between the plaintiff and defendant, an action based upon contract for breach of warranty does not exist." Lawyers Cooperative Publishing Co. v. Muething
(1992), 65 Ohio St.3d 273, 276.
Second, Acme's evidence in opposition to Vilter's Motion for Summary Judgment does not establish or allege that the Vilter compressor was defective or deficient in any way apart from its use in the freezer system designed by Great Lakes. As previously stated, a component manufacturer is not liable for the failure of the end product when the component itself is not defective or dangerous. Temple v. Wean United, Inc., supra, 50 Ohio St.2d at paragraph one of syllabus. The affidavit of Mr. John Puskar, an engineer and witness for Acme, only alleges that the Vilter compressor was not appropriate for the freezer system as designed by Great Lakes. Without some proof that the Vilter compressor was in and of itself defective, Acme cannot prevail on its implied warranty claim.
Third, an implied warranty of fitness for a particular purpose under R.C. § 1302.28 requires that: (1) the seller knew of the buyer's particular purpose; (2) the seller had reason to know that the buyer is relying on the seller's skill or judgment to furnish or select the appropriate goods; and (3) the buyer must rely upon the seller's skill or judgment.Hollingsworth v. The Software House, Inc. (1986),32 Ohio App.3d 61, 65. Acme presented no evidence that it relied on Vilter's expertise or even that it knew that Great Lakes intended to purchase a Vilter compressor.
For the foregoing reasons, Acme's first assignment of error is without merit.
Acme's second assignment of error alleges:
 "The trial court erred in granting Westfield's motion for summary judgment because genuine issues of material fact exist as to whether the evidence submitted in opposition to Westfield's motion demonstrate that Great Lakes' liability to Acme constitutes property damage arising from an occurrence."
For Acme to prevail in this assignment of error it must show that its claims satisfy the threshold provisions for coverage under the Westfield CGL policy and that no exclusions to coverage apply. Westfield argues that Acme has not alleged or presented proof that an "occurrence" has taken place as required by the policy. The Westfield policy specifically provides:
"1. Insuring Agreement.
 "a. We will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies. We will have the right and duty to defend any `suit' seeking those damages. We may at our discretion investigate any `occurrence' and settle any claim or `suit' that may result.
"* * *
 "b. This insurance applies to `bodily injury' and `property damage' only if:
 "(1) The `bodily injury' or `property damage' is caused by an `occurrence' that takes place in the `coverage territory;' and
 "(2) The `bodily injury or `property damage' occurs during the policy period.
The relevant definitions are defined in the CGL policy as follows:
 "3. `Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
"* * *
 "9. `Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
"* * *
"12. `Property damage' means:
 "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
 "b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the `occurrence' that caused it."
Acme has not made any bodily injury claims in this matter. The only remaining event that could trigger coverage under the policy is by way of "property damage" caused by an "occurrence". An "occurrence" is defined in the policy as an, "accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident," however, is not defined by policy. Common words appearing in a written contract are to be given their plain and ordinary meaning unless some manifest absurdity would result or unless some other meaning is clearly intended.
Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241,245. The term accident has been held to mean, "an event which under the circumstances is unusual and unexpected by the person to whom it happens; an unusual, fortuitous, unexpected, unforeseen or unlooked event, * * *". Chepke v.Lutheran Brotherhood (1995), 103 Ohio App.3d 508, 511.
Westfield argues that an allegation of a breach of contract due to improper design and manufacture cannot constitute an "occurrence" or "accident" under the Great Lakes' CGL policy, citing Royal Plastics, Inc. v. State Auto. Mut. Ins. Co. (1994),99 Ohio App.3d 221, in support. In Royal Plastics, Inc., the insured was a manufacturer of water pump components. It had taken out a CGL policy with terms very similar to those at issue in the case at bar. Hercules Products, another manufacturer, filed a lawsuit against Royal Plastics involving claims that the water pump parts were negligently made and that the sales contract, as well as various warranties, were breached. Royal Plastics settled the case and sought to recover from State Automobile Mutual Insurance Company ("State Auto") under its CGL policy. Royal Plastics filed a declaratory judgment action seeking to establish that State Auto had a duty to defend and indemnify it in the Hercules litigation.
The court of appeals held that State Auto had no duty to defend or indemnify because the Hercules complaint failed to allege that an "occurrence," defined in the policy as an "accident," had taken place. Royal Plastics, supra,99 Ohio App.3d at 225-226. The court held that mere allegations of a manufacturer against a component parts supplier for negligent manufacture did not qualify as an occurrence under the State Auto CGL policy. Id.
Westfield's reliance on Royal Plastics is mistaken. The primary reason why the Royal Plastics court denied coverage was that, "[n]o customer ever sued Hercules or Royal for property damage based on an occurrence." Id. at 226. The court examined the Hercules complaint and found no allegations that any accident had occurred, thus based its ruling on the fact that insufficient allegations were contained in the complaint.
In contrast to Royal Plastics, the case sub judice does involve a customer suing a manufacturer for property damage arising from an accident. The essence of Acme's complaint is that Great Lakes' additions and changes to the existing refrigeration system caused the entire system to fail, disrupted its current business operations as well as its expansion plans and required Acme to incur expenses for repairs, labor, utilities, lost profits and damage to its goodwill. Acme's evidence also shows that significant damage was done to the frozen meats being stored in the freezer. (Deposition of Ms. Marion Mike, p. 84). In other words, the design flaws in the freezer system arguably caused an unforeseen and unintended event to occur, namely, the total failure of the freezer, the destruction of the meat in the freezer and the complete disruption of Acme's business. These claims more than fulfilled the CGL policy requirement that there be some allegation of an accident or occurrence.
Westfield argues that Acme's claims do not qualify as "property damage" as defined under the CGL policy. Westfield contends that only physical injury or loss to tangible property is covered. The definitional section of the Commercial General Liability Coverage Form defines "property damage" as both, "physical injury to tangible property, including all resulting loss of use of that property," as well as, "[l]oss of use of tangible property that is not physically injured." Acme has alleged and provided evidence that it has suffered injury to tangible property (e.g. the pre-existing refrigeration system, the burned-out Vilter compressor, and the meat which was ruined when the freezer failed), as well as loss of use of the freezer. Under the plain meaning of the coverage provisions, Acme has provided evidence that it has sustained "property damage" to the extent necessary to create a genuine issue of material fact.
Westfield argues in its original Motion for Summary Judgment that four exclusions in the CGL policy apply to deny coverage. An insurance policy exclusion must be clear and exact in order to be given effect. U.S. Fid. Guar. Co. v. Lightning Rod Mut. Ins.Co. (1997), 80 Ohio St.3d 584, 586. When the language of the policy is doubtful or uncertain, the language will be construed strictly against the insurer and liberally in favor of the insured party. Faruque v. Provident Life Acc. Co. (1987), 31 Ohio St.3d 34,38. When the provisions of an insurance policy reasonably support more than one interpretation, the court should adopt the meaning that favors the insured party. Id. Thus, any reasonable construction which results in coverage for the insured should be adopted by the trial court. Sterling Merchandise Co. v. HartfordIns. Co. (1986), 30 Ohio App.3d 131, 137. Only when the terms of the policy are clear and unambiguous does the interpretation of the policy become a matter of law. Inland Refuse Transfer Co. v.Browning-Ferris Industries of Ohio, Inc. (1984), 15 Ohio St.3d 321,322.
The first exclusion relied upon by Westfield is the "work product" exclusion which states:
"2. Exclusions.
"This insurance does not apply to:
"* * *
 "k. `Property damage' to `your product' arising out of it or any part of it."
The policy defines "your product" as follows:
"14. `Your product' means"
 "a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
"(1) You;
"(2) Others trading under your name; or
 "(3) A person or organization whose business or assets you have acquired; and
 "b. Containers (other than vehicles), materials, part or equipment furnished in connection with such goods or products.
"`Your product' includes:
 "a. Warranties or representations made at any time with respect to the fitness, quality, durability or performance or use of `your product;' and
 "b. The providing of or failure to provide warnings or instructions.
 "`Your product' does not include vending machines or other property rented to or located for the use of others but not sold."
Westfield argues that Acme's complaint alleges that Great Lakes breached warranties, including the implied warranty of fitness for a particular purpose. Westfield points out that warranties are included in the definition of "your product." Westfield argues that the reason for including warranties under the definition of "your product" is to eliminate the possibility of the insurer becoming the warrantor of the insured's products.
Westfield's argument is not persuasive. The typical "work product" exclusion in a commercial liability policy does not apply to damage to the property of others caused by the insured's faulty workmanship or defective product. 9 Couch on Insurance 3d (1997, Supp. 2000) Section 130:8. Although part of Acme's claims fall within the "work product" exclusion, its claims for the meat which was destroyed as well as claims for injury to the pre-existing refrigeration system do not constitute Great Lakes' "product," meaning the freezer components designed and installed by Great Lakes. Only the components of the system actually utilized and installed by Great Lakes in the redesigned freezer would fall into the "work product" exclusion.
The second exclusion which Westfield contends should apply is the "products/completed operations hazard exclusion." This exclusion states:
"2. Exclusions.
"This insurance does not apply to:
"* * *
 "l. `Property damage' to `your work' arising out of it or any part of it and including in the `products-completed operations hazard.'
 "This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
The "products-completed operations hazard" is defined as follows:
 "11. a. `Products-completed operations hazard' includes all `bodily injury' and `property damage' occurring away from premises you own or rent and arising out of `your product' or `your work' except:
"(1) Products that are still in your physical possession; or
"(2) Work that has not yet been completed or abandoned.
 "b. `Your work' will be deemed completed at the earliest of the following times:
 "(1) When all of the work called for in your contract has been completed.
 "(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
 "(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
 "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as complete."
"Your work" is defined as:
"15. `Your work' means:
"a. Work or operations performed by you or on your behalf; and
 "b. Materials, parts or equipment furnished in connection with such work or operations.
"`Your work' includes:
 "a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of `your work,' and
 "b. The providing of or failure to provide warning or instructions."
Two issues arise as to whether Acme's claims fall within this exclusion. The first is whether Acme's injuries occurred after the Great Lakes' contractual duties were completed. Acme's complaint alleges: "8. Almost immediately after [Great Lakes] completed its work at [Acme's] place of business, the freezer began to experience a series of malfunctions * * *." Although no Ohio court has ruled on the issue, at least one court has held that even minor adjustments which remained to be done on a heating and air-conditioning system took the claim out of the completed operations exclusion of a CGL policy. Southern Guaranty Ins.Co. v. Jaffares (Ga.App. 1989), 379 S.E.2d 167, 169. Acme has at least raised some doubt as to whether Great Lakes had completed its performance under the contract, doubt which should survive summary judgment. Because there is a factual dispute as to whether Great Lakes had completed its performance, the issue as to whether this exclusion would apply becomes one for the jury.
The second issue is whether all of Acme's injuries relate to "your work" as defined in the policy and the exclusion. As we stated in our analysis of the aforementioned "work product" exclusions, not all of Acme's damage claims of "property damage" are for the specific work done by Great Lakes, but rather, arise from collateral harm to the pre-existing refrigeration system or to the meat in the freezer which was ruined when the freezer failed. The "products/completed operations hazard" only excludes coverage for "your work," meaning work done by Great Lakes, including materials, parts, and items covered by any warranties of fitness, quality, durability, performance, or use of such work. Acme's claims, at least in part, do not necessarily fall within the definition of "your work" as stated in the policy. Again, Acme has raised sufficient doubt to survive summary judgment.
The third exclusion which Westfield argues should apply is the "impaired property" exclusion. This exclusion states:
"2. Exclusions.
"This insurance does not apply to:
"* * *
 "m. `Property damage' to `impaired property' or property that has not been physically injured, arising out of:
 "(1) A defect, deficiency, inadequacy or danger condition in `your product' or `your work;' or
 "(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
 This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to `your product' or `your work' after it has been put to its intended use."
"Impaired property" is defined as:
 "5. `Impaired property' means tangible property, other than `your product' or `your work,' that cannot be used or is less useful because:
 "a. It incorporates `your product' or `your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
 "b. You have failed to fulfill the terms of a contract or agreement;
"If such property can be restored to use by:
 "a. The repair, replacement, adjustment or removal of `your product' or `your work;'
"b. Your fulfilling the terms of the contract or agreement."
Westfield contends that all of Acme's claims are excluded as "impaired property," both because Acme's injuries arose out of a design defect which incorporated Great Lakes' work into Acme's pre-existing equipment, and because Acme's claims are based on a breach of contract.
As earlier discussed, however, not all of Acme's claims fall under the definition of "impaired property." Acme has alleged that meat which was stored in the defective freezer was ruined when the freezer failed. Acme's allegations arise both under contract law (breach of contract, breach of warranty) and tort law (negligent performance of contractual obligations). Acme's claim will be excluded if it either incorporates the work done by Great Lakes or is a result of Great Lakes' failure to fulfill the terms of its contract. The damaged meat cannot be construed as somehow incorporated into the defectively designed freezer system. Nor was the meat necessarily damaged due to the failure of Great Lakes to fulfill its contract. Acme's tort claim does not depend on whether Great Lakes fulfilled all of its obligations, but rather, alleges that the performance was negligent. Therefore, Acme's claim for damages due to destroyed meat does not clearly fall under the "impaired property" exclusion.
Additionally, any claims Acme has for the destruction of the pre-existing refrigeration system do not fall under the exclusion. The exclusion only applies if "impaired property" can be restoredto use by either the repair, replacement, adjustment or removal of the work done by Great Lakes, or by the fulfillment of the terms of the contract. Any property that has been destroyed or irreparably damaged cannot be restored to use. Therefore, the "impaired property" exclusion does not necessarily bar all of Acme's claims from coverage under the CGL policy.
The fourth and final exclusion relied on by Westfield is the "sistership exclusion," which states:
"2. Exclusions.
"This insurance does not apply to:
"* * *
 "n. Damages claimed for any loss, cost or expenses incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
"(1) `Your product;'
"(2) "your work;' or
"(3) `Impaired property;'
 "If such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it."
The "sistership exclusion" derives its name from the aircraft industry practice of recalling all planes of a particular model after a crash involving the same model. 9 Couch on Insurance 3d (1997, Supp. 2000) Section 130:12. Courts have required that a recall actually take place before a "sistership" provision in an insurance policy would apply. Erie Ins. Exchange v. ColonyDevelopment Corp. (Dec. 23, 1999), Franklin App. No. 99 AP 329, unreported. "When such a recall occurs, the provision provides that damages are excluded for the removal from the market of `sister' products to prevent future failures." Id. Damages claimed for the initial failure or defect are not excluded by the "sistership exclusion." Id. Neither Acme nor Westfield has claimed that any product, work, or design has been recalled. Additionally, the exclusion would not apply to the original product or system which failed. Therefore none of Acme's claims are barred by this exclusion.
Acme has raised the question that some of its claims qualify under the threshold coverage provisions of the Westfield CGL policy and that some of its claims, particularly those for destroyed meat products and irreparable damage to the aspects of the pre-existing refrigeration system, survive the exclusions cited by Westfield. While nothing in this opinion should be construed as affecting the final outcome in this matter, we hold that summary judgment in this matter was inappropriate as to certain claims. Acme's second assignment of error therefore has merit.
For the foregoing reasons, the November 16, 1998 Judgment Entry granting summary judgment in favor of Vilter is affirmed. The July 8, 1998 grant of summary judgment to Westfield is reversed and remanded to the trial court for further proceedings according to law and consistent with this Court's opinion.